IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY DISTEFANO, JAMES CHRISTOPHER | * | CIVIL ACTION NO. _____ |
| BALIUS, EDWARD D. ROSS, JR., MICHAEL A. | * | |
| CANNETTE, JOHN D. FRANKLIN, JR., JOHN D. | * | JUDGE: |
| FRANKLIN, III, JEFFREY POWELL, GEORGE | * | |
| BOYD, CLARENCE R. SEYMOUR, JR., JACK | * | SECTION: |
| TIBLIER, PATRICK POIRSON, MICHAEL BUTLER, | * | |
| MICHAEL A. CATO, ROBERT ANDERSON, JAMES | * | |
| A. MILLER, ROBERT E. CLISBY, MIKE FOTO, | * | |
| JAMES LARRY SCHONEWITZ, ALLEN | * | |
| JOHNSON, AND JOHNNY O'BRIEN, | * | |
| Plaintiffs | * | |
| | * | |
| VERSUS | * | |
| | * | |
| BP AMERICA PRODUCTION COMPANY, AND | * | |
| BP EXPLORATION AND PRODUCTION, INC., | * | |
| Defendants | * | |

**************************************************************************

## **<u>COMPLAINT</u>**

COMES NOW Anthony DiStefano, James Christopher Balius, Edward D. Ross,

Jr., Michael A. Cannette, John D. Franklin, Jr., John D. Franklin, III, Jeffrey Powell,

George Boyd, Clarence R. Seymour, Jr., Jack Tiblier, Patrick Poirson, Michael Butler,

Michael A. Cato, Robert Anderson, James A. Miller, Robert E. Clisby, Mike Foto, James

Larry Schonewitz, Allen Johnson and Johnny O'Brien (collectively "Plaintiffs"), who file

this, their Complaint, against BP America Production Company and BP Exploration and

Production, Inc. ("Defendants"), alleging as follows:

## PARTIES

### 1. Plaintiffs

Each of the Plaintiffs below was hired under contract by the Defendants to participate in the Defendants' Vessels of Opportunity Program ("VoO"), which occurred in the Gulf of Mexico.

(a)     Anthony DiStefano is a Mississippi citizen.   Mr. DiStefano is a recreational fisherman.

(b)     James C. Balius is a Mississippi citizen.  Mr. Balius is a commercial fisherman.

(c)     Edward D. Ross, Jr. is a Mississippi citizen.  Mr. Ross is a commercial fisherman.

(d)     Michael A. Cannette is a Mississippi citizen.   Mr. Cannette is a commercial fisherman.

(e)     John D. Franklin, Jr. is a Mississippi citizen.  Mr. Franklin is a commercial fisherman.

(f)     John D. Franklin, III, is a Mississippi citizen.   Mr. Franklin is a commercial fisherman.

(g)     Jeffrey Powell is a Mississippi citizen.   Mr. Powell is a commercial fisherman.

(h)     George Boyd is a Mississippi citizen.   Mr. Boyd is a commercial fisherman.

(i)     Clarence R. Seymour, Jr. is a Mississippi citizen.  Mr. Seymour is a commercial charter boat fisherman.

(j)     Jack Tiblier is a Mississippi citizen.  Mr. Tiblier is a recreational fisherman.

(k)     Patrick Poirson is a Mississippi citizen.  Mr. Poirson is a recreational fisherman.

(l)     Michael Butler is a Mississippi citizen.  Mr. Butler is a recreational fisherman.

(m)     Michael A. Cato is a Mississippi citizen.  Mr. Cato is a recreational fisherman.

(n)     Robert Anderson is a Mississippi citizen.  Mr. Anderson is a recreational fisherman.

(o)     James A. Miller is a Mississippi citizen.  Mr. Miller is a commercial fisherman.

(p)     Robert E. Clisby is a Mississippi citizen.  Mr. Clisby is a recreational fisherman.

(q)     Mike Foto is a Mississippi citizen.  Mr. Foto is a commercial charter boat fisherman.

(r)     James Larry Schonewitz is a Mississippi citizen.  Mr. Schonewitz is a recreational fisherman.

(s)     Allen Johnson is a Mississippi citizen.  Mr. Johnson is a recreational fisherman.

3

(t)     Johnny O'Brien is a Mississippi citizen.  Mr. O'Brien is a recreational fisherman.

## 2.  Defendants

(a)     BP America Production Company (hereinafter collectively referred to, along with entities described in (b), as "BP") is a Delaware corporation doing business within the jurisdictional limitation of this District; it may be served process on its registered agent for service, CT Corporation System, at 5615 Corporate Blvd, Ste. 400B, Baton Rouge, LA 70808;

(b)     BP Exploration and Production Company, Inc. is a is a Delaware corporation doing business within the jurisdictional limitation of this District; it may be served process on its registered agent for service, CT Corporation System, at 5615 Corporate Blvd, Ste. 400B, Baton Rouge,  LA 70808.

## JURISDICTION AND VENUE

### 3.

This Honorable Court has jurisdiction of this matter pursuant to Article III of the Constitution of the United States and 28 USC 1333, as this matter falls with the Court's Admiralty and Maritime jurisdiction.  Venue is proper as per the forum selection clause of the Charter Partys at issue.

## FACTS

### 4.

(a)     Anthony DiStefano entered into an agreement with BP on or about May 4, 2010 (the "Agreement").  Mr. DiStefano began working for BP under the Agreement on

or about May 7, 2010.  Although he was being paid by BP, he was not deployed into service until on or about May 13, 2010.  On or about September 3, 2010, Mr. DiStefano received formal notice from BP of its intent not to renew its contract with him.  BP had not formally notified Mr. DiStefano of its intention not to renew the Agreement until that time.  However, BP did not remove its equipment from Mr. DiStefano's boat, nor have it inspected for contamination and/or verify it was not contaminated until some time later.  Mr. DiStefano's boat, having been used by BP and still under its direction and control, was inspected for final decontamination on or about October 27, 2010.  BP owes Mr. DiStefano payment, day-to-day, for boat use and crew pay from initial activation of Mr. DiStefano's contract through formal notice of off-hire status and/or final decontamination, but has failed to pay Mr. DiStefano for all such time.

(b)     James C. Balius entered into an agreement with BP on or about May 18, 2010 (the "Agreement").  Mr. Balius began working for BP under the Agreement on or about June 10, 2010.  Although he was activated on June 10, 2010, he has not received payment for that date by BP.  He was deployed into service until on or about June 11, 2010.  Mr. Balius has not received formal notice from BP of its intent not to renew its contract with him.  Mr. Balius's boat, having been used by BP and still under its direction and control, has not been inspected for final decontamination, or if such inspection has occurred, such inspection and verification of final decontamination, or lack of need for decontamination, was not communicated, formally or otherwise, to Mr. Balius.  Mr. Balius's boat, up through his receipt of communication from BP that his boat was no longer on hire, or communication by BP or other authorized personnel that his boat posed

5

no environmental hazard post-spill cleanup, was still under the direction and/or control of BP.  BP owes Mr. Balius payment, day-to-day, for boat use and crew pay from initial activation of Mr. Balius's contract through formal notice of off-hire status and/or final decontamination and/or formal communication to Mr. Balius of off-hire status and/or verification of inspection for final decontamination thereof, but has failed to pay Mr. Balius for all such time.

      (c)    Edward D. Ross, Jr. entered into an agreement with BP on or about May 16, 2010 (the "Agreement").  Mr. Ross began working for BP under the Agreement on or about June 22, 2010, but has not been paid for that day, nor has he been paid for additional days while his vessel was under BP's direction and/or control and/or was not decontaminated.  Mr. Ross's vessel was deployed on or about May 24, 2010 and continued to be deployed through August 6, 2010.  Although some personnel with whom Mr. Ross was unfamiliar with stopped by and took photos of his boat on or about July 27, 2010, no one communicated to Mr. Ross the purpose, or results, of the inspection.  Mr. Ross continued to be deployed.  On or about September 3, 2010, Mr. Ross received formal notice from BP of its intent not to renew its contract with him.   Mr. Ross has attempted to contact  personnel authorized to perform decontamination several times to get his boat set up for decontamination, but could not get anyone to set up his decontamination.  Thus, Mr. Ross's boat remains under the direction and control of BP, and/or remains unusable by Mr. Ross to his detriment and to BP's enrichment.  BP owes Mr. Ross payment, day-to-day, for boat use and crew pay from initial activation of Mr. Ross's contract through formal notice of off-hire status and/or final decontamination

and/or verification of final decontamination, which has not yet occurred, but has failed to pay Mr. Ross for all such time.  Further, damage and/or modifications to Mr. Ross's boat and/or equipment which were incurred during hire by BP and/or as a direct result of hire by BP has not been repaired by BP, nor has BP paid for such repairs.  Pursuant to the Agreement prepared by BP, BP owes Mr. Ross money to pay for the cost of such damage and/or modifications incurred during deployment for BP and/or as a direct result of such deployment by BP.

(d)    Michael A. Cannette entered into an agreement with BP on or about May 10, 2010 (the "Agreement").   Mr. Cannette began working for BP under the Agreement on or about June 4, 2010.   On or about September 31, 2010, Mr. Cannette received formal notice from BP of its intent not to renew its contract with him.  Mr. Cannette's boat, having been used by BP and still under its direction and control, was inspected for final decontamination on or about December 4, 2010.   Thus, Mr. Cannette's boat remained under the direction and control of BP, and/or remained unusable by Mr. Cannette to his detriment and to BP's enrichment.  BP owes Mr. Cannette payment, day-to-day, for boat use and crew pay from initial activation of Mr. Cannette's contract through formal notice of off-hire status and/or verification of final decontamination, but has failed to pay Mr. Cannette for all such time.  Further, damage and/or modifications to Mr. Cannette's boat and/or equipment which were incurred during hire by BP and/or as a direct result of hire by BP has not been repaired by BP, nor has BP paid for such repairs. Pursuant to the Agreement prepared by BP, BP owes Mr. Cannette money to pay for the

cost of such damage and/or modifications incurred during deployment for BP and/or as a direct result of such deployment by BP.

(e)     John D. Franklin, Jr. entered into an agreement with BP on or about May 11, 2010 (the "Agreement").     Mr. Franklin, Jr. began working for BP under the Agreement on or about May 27, 2010, at which time his vessel and crew were deployed into service.   Mr. Franklin, Jr. has not received formal notice from BP of its intent not to renew its contract with him.   Mr. Franklin, Jr.'s boat, having been used by BP and still under its direction and control, has not been inspected for final decontamination.   A cursory inspection was done on July 16, 2010, but the purpose of such inspection was not communicated to Mr. Franklin, Jr.   Mr. Franklin, Jr. continued to remain deployed after that date, through July 21, 2010 or so.   Materials owned by BP continue to remain on Mr. Franklin, Jr.'s boat, and Mr. Franklin, Jr.'s boat remained without rigging and/or equipment necessary for commercial fishing per BP's direction.   BP owes Mr. Franklin, Jr. payment, day-to-day, for boat use and crew pay from initial activation of Mr. Franklin, Jr.'s contract through formal notice off-hire status and/or verification of final decontamination, whichever date is later, but has failed to pay Mr. Franklin, Jr. for all such time.   Thus, Mr. Franklin, Jr.'s boat remains under the direction and control of BP, and/or remains unusable by Mr. Franklin, Jr. to his detriment and to BP's enrichment.   As of the date of the filing of this Complaint, Mr. Franklin, Jr.'s boat still has oil residue adhering to and/or embedded in the surface of the hull.   Further, damage and/or modifications to Mr. Franklin, Jr.'s boat and/or equipment which were incurred during hire by BP and/or as a direct result of hire by BP has not been repaired by BP, nor has BP

8

paid for such repairs.  Pursuant to the Agreement prepared by BP, BP owes Mr. Franklin, Jr. money to pay for the cost of such damage and/or modifications incurred during deployment for BP and/or as a direct result of such deployment by BP.

      (f)     John D. Franklin, III entered into an agreement with BP on or about May 11, 2010 (the "Agreement").   Mr. Franklin, III began working for BP under the Agreement on or about May 27, 2010, but was not paid by BP for that time.  The first invoice date paid by BP was on or about June 6, 2010.  Mr. Franklin, III was deployed beginning on or about June 6, 2010.  Mr. Franklin, III has not received formal notice from BP of its intent not to renew its contract with him, nor has he been made aware of whether his boat is contaminated.   Until BP has communicated under the terms of the Agreement to Mr. Franklin, III that his boat is no longer on hire and/or that his boat has been verified that it is not contaminated, whichever date is latest, Mr. Franklin, III's boat remains under the direction and control of BP, and/or remains unusable by Mr. Franklin, III to his detriment and to BP's enrichment.  BP owes Mr. Franklin, III payment, day-to-day, for boat use and crew pay from initial activation of Mr. Franklin, III's contract through formal notice of off-hire status and/or verification of final decontamination, but failed to pay Mr. Franklin, III for all such time.

      (g)     Jeffrey Powell entered into an agreement with BP on or about May 4, 2010 (the "Agreement").   Mr. Powell began working for BP under the Agreement on or about June 14, 2010, at which time he was also deployed.   Mr. Powell has not been reimbursed by BP for fuel used in BP's service.   Mr. Powell's boat, having been used by BP and still under its direction and control, was inspected for final decontamination on or

about October 10, 2010.  Until BP communicated, under the terms of the Agreement, to Mr. Powell that his boat is no longer on hire and/or that his boat has been verified that it is not contaminated, whichever date is latest, Mr. Powell's boat remained under the direction and control of BP, and/or remains unusable by Mr. Powell to his detriment and to BP's enrichment.  BP owes Mr. Powell payment, day-to-day, for boat use and crew pay from initial activation of Mr. Powell's contract through final decontamination, but has failed to pay Mr. Powell for all such time, and has failed to pay Mr. Powell for fuel purchased and used by him through his final day of deployment.

(h)     George Boyd entered into an agreement with BP on or about May 12, 2010 (the "Agreement").   Mr. Boyd also began working for BP under the Agreement on or about May 12, 2010.  Although he was being paid by BP, he was not deployed into service until on or about June 5, 2010.   Mr. Boyd received formal notice from BP of its intent not to renew its contract with him some time in late August or early September. However, Mr. Boyd's boat was not inspected and verified for final decontamination until November 9, 2010.  As BP and/or its authorized representatives directed him to do, Mr. Boyd had removed all of his rigging and other materials and equipment necessary for commercial fishing, and that rigging, materials, and equipment remained removed until verification of final decontamination.  Until BP communicated, under the terms of the Agreement, to Mr. Boyd that his boat was no longer on hire and/or that his boat has been verified that it was not contaminated, whichever date occurred latest, Mr. Boyd's boat remained under the direction and control of BP, and/or remained unusable by Mr. Boyd to his detriment and to BP's enrichment.  BP owes Mr. Boyd payment, day-to-day, for

10

boat use and crew pay from initial activation of Mr. Boyd's contract through final decontamination, but has failed to pay Mr. Boyd for all such time

(i)     Clarence R. Seymour, Jr. entered into an agreement with BP on or about May 9, 2010 (the "Agreements").   Mr. Seymour had three vessels working under his Agreements with BP.   The contract numbers are 55259.1, 55259.2, and 55259.3.   Mr. Seymour began working for BP under agreement 55295.1 and 55295.2 on or about May 9, 2010.   Although he was activated by BP, he was not deployed into service for either vessel under contracts 55259.1 and 55259.2 until on or about May 14, 2010.   He has not been paid under 55259.1 and/or 55259.2 from May 9 to June 2nd.   Further, on or about September 3, 2010, Mr. Seymour received notice by certified letter from BP of its intent not to renew its contracts with him.   Mr. Seymour's vessel under contract 55259.1, having been used by BP and still under its direction and control, was inspected for final decontamination on or about November 29, 2010.  BP owes Mr. Seymour payment, day-to-day, for use of the vessel under 55259.1 and crew pay from initial activation of that contract through verification of final decontamination, but has failed to pay Mr. Seymour for all such time.  BP also owes Mr. Seymour payment, day-to-day, for use of the vessel under 55259.2 and crew pay from initial activation of that contract through verification of final decontamination and/or receipt of Mr. Seymour of the letter of intent to not renew the contract, whichever is later.  BP also owes Mr. Seymour payment, day-to-day, for use of the vessel under 55259.3 and crew pay from initial activation of that contract through receipt of Mr. Seymour of the letter of intent to not renew the contract, which was on or about September 3, 2010.

(j)      Jack Tiblier entered into an agreement with BP on or about May 10, 2010 (the "Agreement").  Mr. Tiblier began working for BP under the Agreement on or about May 6, 2010.  Although he was being paid by BP, he was not deployed into service until on or about May 9, 2010.  Mr. Tiblier was removed from deployment, on standby, from July 6, 2010 through August 11, 2010.  He was redeployed on August 12, 2010, and was paid from that date through August 21, 2010.   Although he attempted to have the vessel decontaminated, he was unable to do so because of apparent inability of BP or its authorized representative(s), agent(s), or contractor(s), and has yet to have the vessel decontaminated and/or verified for final decontamination.   BP owes Mr. Tiblier payment, day-to-day, for vessel use and crew pay from initial activation of the contract through final decontamination, but has failed to pay Mr. Tiblier for all such time.  Presently BP owes Mr. Tiblier payment for July 6 through August 11, 2010; and for August 22nd through the present.   BP also owes Mr. Tiblier for repairs and/or modifications and/or equipment costs incurred by Mr. Tiblier as a direct result of the vessel's use in the VoO program.

(k)      Patrick Poirson entered into an agreement with BP on or about May 6, 2010 (the "Agreement").  Mr. Poirson began working for BP under the Agreement on or about May 9, 2010.  He was not deployed into service until on or about June 21, 2010.  He remained in deployment through July 21, 2010.  On or about September 2, 2010, Mr. Poirson received notice by certified letter from BP of its intent not to renew two contracts, but neither contract was his.  To date, he has not received a letter or other formal communication from BP regarding his contract.  Nor has he received any notice

12

that his vessel has been verified for final decontamination.  Mr. Poirson's vessel has been used by BP and remained under its direction and control.  BP owes Mr. Poirson payment, day-to-day, for vessel use and crew pay from initial activation of Mr. Poirson's contract through final decontamination or through his receipt of notice of BP's intent to not renew the contract, whichever is later, but BP has failed to pay Mr. Poirson for all such time. Presently BP owes Mr. Poison payment for May 25, 2010 through June 20, 2010, and for July 22, 2010 through the present.

(l)     Michael Butler entered into an agreement with BP on or about May 19, 2010 (the "Agreement").   Mr. Butler began working for BP under the Agreement on or about June 11, 2010.  Although he was being paid by BP, he was not deployed into service until on or about June 18, 2010.   On or about August 20, 2010, Mr. Butler received notice by certified letter from BP of its intent not to renew its contract with him. Mr. Butler's vessel, having been used by BP and still under its direction and control, and heavily contaminated with oil, was inspected and sent through final decontamination on or about November 4, 2010.  BP owes Mr. Butler payment, day-to-day, for vessel use and crew pay from initial activation of Mr. Butler's contract through final decontamination, but has failed to pay Mr. Butler for all such time.  BP owes Mr. Butler payment for June 18, 2010 through July 1, 2010, but has only partially paid Mr. Butler $10,800.00 of the $23,200.00 owed; BP owes Mr. Butler payment for July 2, 2010 through November 4, 2010.

(m)     Michael A. Cato entered into an agreement with BP on or about May 5, 2010 (the "Agreement").   Mr. Cato began working for BP under the Agreement on or

about May 7, 2010.   On or about August 20, 2010, Mr. Cato received notice by certified letter from BP of its intent not to renew its contract with him.  Mr. Cato's vessel was not verified for final decontamination until on or about September 16, 2010, up until which Mr. Cato's vessel was still under BP's direction and control.  BP owes Mr. Cato payment day-to-day, for vessel use and crew pay from initial activation of Mr. Cato's contract through verification of final decontamination, but has failed to pay Mr. Cato for all such time.  BP owes Mr. Cato payment from July 9, 2010 through September 16, 2010.

(n)     Robert Anderson entered into an agreement with BP on or about May 12, 2010 (the "Agreement").   Mr. Anderson began working for BP under the Agreement on or about May 14, 2010.  Although he was being paid by BP, he was not deployed into service until on or about June 12, 2010.  He was placed on standby beginning June 26, 2010.  He was not paid for June 26, 2010.  He was again deployed from June 26, 2010 through July 21, 2010, but was paid only through July 12, 2010.  On or about August 20, 2010, Mr. Anderson received notice by certified letter from BP of its intent not to renew its contract with him.  Mr. Anderson received no final verification of decontamination. BP owes Mr. Anderson payment, day-to-day, for vessel use and crew pay from initial activation of Anderson's contract through verification of final decontamination or receipt of BP's notice on nonrenewal of charter agreement, whichever is later.  BP has failed to pay Mr. Anderson for all such time.

(o)     James A. Miller entered into an agreement with BP on or about May 10, 2010 (the "Agreement").  Mr. Miller began working for BP under the Agreement on May 10, 2010.  Although he was being paid by BP, he was not deployed into service until on

14

or about May 18, 2010.  On or about September 3, 2010 and October 7, 2010, Mr. Miller received two separate and contradictory notices by certified letters from BP (one from Charlotte Thompson, and another from Judith Paul) of its intent not to renew its contract with him.  Ms. Thompson's letter listed an effective nonrenewal date of August 27, 2010, while Ms. Paul's letter listed an effective nonrenewal date of October 5, 2010.  Mr. Miller's vessel, having been used by BP and still under its direction and control, was inspected for final decontamination on or about October 16, 2010.   Subsequent to that inspection, after Mr. Miller removed his vessel from the water, there was a great deal of oil contamination found on the hull of the vessel.  On or about December 3, 2010, Mr. Miller contacted BP to have decontamination scheduled.  He spoke with Jessica Wilson at 251-445-4071, who said BP was not scheduling any more decontamination of vessels, that they were trying to shut the program down, and that someone would contact him for decontamination within the next few weeks.  BP owes Mr. Miller payment, day-to-day, for vessel use and crew pay from initial activation of Mr. Miller's contract through final decontamination, but has failed to pay Mr. Miller for all such time.  Presently BP owes Mr. Miller payment for July 24, 2010 through the present.

(p)     Robert E. Clisby entered into an agreement with BP on or about May 6, 2010 (the "Agreement").  Mr. Clisby began working for BP under the Agreement on or about August 9, 2010.  Although he was being paid by BP, he was not deployed into service until on or about August 10, 2010.  Mr. Clisby has never received notice by certified letter from BP of its intent not to renew its contract with him.  Mr. Clisby's vessel, having been used by BP and still under its direction and control, was inspected for

final decontamination on or about October 19, 2010.  BP owes Mr. Clisby payment, day-to-day, for vessel use and crew pay from initial activation of Mr. Clisby's contract through final decontamination, but has failed to pay Mr. Clisby for all such time.  Mr. Clisby is due payment from BP for August 9, 2010 through August 12, 2010; for September 25, 2010 through October 18, 2010.

(q)     Mike Foto entered into an agreement with BP on or about May 9, 2010 (the "Agreement").  Mr. Foto also began working for BP under the Agreement on or about May 9, 2010, at which time he was deployed.  He remained deployed from May 9, 2010 through July 18, 2010.  Mr. Foto has never received notice from BP of its intent not to renew its contract with him.   Mr. Foto's vessel, having been used by BP and still under its direction and control, was inspected for final decontamination on or about November 11, 2010.  BP owes Mr. Foto payment, day-to-day, for vessel use and crew pay from initial activation of Mr. Foto's contract through final decontamination, but has failed to pay Mr. Foto for all such time.  BP owes Mr. Foto payment from July 19, 2010 through November 11, 2010.

(r)     James Larry Schonewitz entered into an agreement with BP on or about May 13, 2010 (the "Agreement").  Mr. Schonewitz began working for BP under the agreement on or about June 5, 2010.  He was deployed into service on or about June 6, 2010, and remained so through July 2, 2010.  At that time he was told he would be placed on deployment rotation.   On or about August 20, 2010, Mr. Schonewitz received notice by certified letter from BP of its intent not to renew its contract with him.  Mr. Schonewitz's vessel, having been used by BP and still under its direction and control,

16

was inspected for final decontamination on or about October 20, 2010.  BP owes Mr. Schonewitz payment, day-to-day, for vessel use and crew pay from initial activation of Mr. Schonewitz's contract through verification of final decontamination, but has failed to pay Mr. Schonewitz for all such time. BP owes Mr. Schonewitz payment for July 3, 2010 through October 20, 2010.    BP also owes Mr. Schonewitz for repairs and/or modifications and/or equipment costs incurred by Mr. Schonewitz as a direct result of the vessel's use in the VoO program.

(s)    Allen Johnson entered into an agreement with BP on or about May 12, 2010 (the "Agreement").  Mr. Johnson began working for BP under the Agreement on or about June 4, 2010, but was never paid.  On or about August 20, 2010, Mr. Johnson received notice by certified letter from BP of its intent not to renew its contract with him. BP owes Mr. Johnson payment, day-to-day, for vessel use and crew pay from initial activation of Me. Johnson's contract through receipt of notice of nonrenewal of the agreement, but failed to pay Mr. Johnson for all such time.  BP owes Mr. Johnson payment for June 4, 2010 through August 20, 2010.

(t)    Johnny O'Brien entered into an agreement with BP on or about May 15, 2010 (the "Agreement").  Mr. O'Brien began working for BP under the Agreement on or about June 10, 2010.  Mr. O'Brien was put on standby on three occasions.  His vessel remained in the service of BP, and under its direction and control the entire time.  Mr. O'Brien has never received notice from BP of its intent not to renew its contract with him.  Mr. O'Brien was told by BP (or its agent and/or representative named "Sonja") that his vessel was deactivated on November 24, 2010.  Despite BP's cursory inspection of

Mr. O'Brien's vessel, Mr. O'Brien discovered that the hull of the vessel was contaminated with oil when he removed the vessel from the water on or about November 22, 2010.  Mr. O'Brien then had to decontaminate and repair the hull himself.  BP owes Mr. O'Brien payment, day-to-day, for vessel use and crew pay from initial activation of Mr. O'Brien's contract through verification of final decontamination and/or actual decontamination of the hull, as done by Mr. O'Brien, and/or receipt of notice of nonrenewal of his contract, but has failed to pay Mr. O'Brien for all such time. BP owes Mr. O'Brien payment for May 26, 2010 through June 9, 2010; for July 8, 2010 through July 14, 2010; for August 3, 2010 through August 12, 2010; and for August 23, 2010 through the present.  BP also owes Mr. O'Brien for repairs and/or modifications and/or equipment costs incurred by Mr. O'Brien as a direct result of the vessel's use in the VoO program.

5.

The Charter Agreements were all drafted by BP, and Plaintiffs sought work for their vessels in mitigation of the Deep Water Horizon oil spill, pursuant to BP's advertised Vessels of Opportunity Program.  Plaintiffs sought work for their vessels by entering into BP's charters, attending training as required by BP, and otherwise complying with BP's requirements including having their vessels equipped as required by BP.  Some Plaintiffs, in order to comply with BP's requirements for activation, had to remove rigging and other equipment essential for commercial fishing.  Once activated, charter payments were supposed to be made as stated in the Charter Party documents.

18

6.

As a condition for chartering their vessels to BP, with few exceptions, Plaintiffs were prohibited from using their vessels in any other endeavors.  In addition, as a consequence to chartering their vessels to BP, Plaintiffs, due to environmental and/or regulatory and/or concerns of being fined by governmental agencies, were unable to use their vessels in any other endeavors until decontamination and/or verification of final decontamination was provided.  Plaintiffs have invoiced BP for the charter hire, but BP has failed to make payment in full.  BP's failure to make proper payment, as provided by the charters drafted by BP, is a breach of the charter party between BP and the Plaintiffs for which BP is liable to Plaintiffs for damages.  BP's charter partys and requirements have prevented Plaintiffs from using their vessels in any ways other than BP designated work, until final decontamination or verification of final decontamination.  On or about September 2, 2010, Plaintiffs, or most of them, received correspondence from BP purporting to terminate the charters, but BP has failed to perform decontamination of many of Plaintiffs' vessels and/or has failed to pay Plaintiffs through verification of final decontamination.  BP's prevention of Plaintiffs' use of their vessels in other endeavors, either directly under the Agreement(s) and/or as a result of the requirements under the Agreement(s) and/or as a result of the contamination and/or verification of lack of contamination, and BP's delay from such verification being completed, requires that BP make payment on the basis of *quantum meruit*.  Further, BP's failure to make payment in full to Plaintiffs and, by its actions, prevented Plaintiffs from using their vessels in other

endeavors unjustly enriched BP and unjustly impoverished Plaintiffs.  BP is therefore liable to Plaintiffs on the basis of unjust enrichment.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs pray this Honorable Court to issue process and serve same upon BP, requiring BP to appear and answer this Complaint and, upon final hearing, issue judgment in favor of the Plaintiffs against BP for:

1) Unpaid time at the rate specified in the carter parties from formal activation through formal deactivation or formal verification of final decontamination, whichever is later, in accordance with the contract and/or *Quantum Meruit* and/or unjust enrichment;

2) Payment of and/or reimbursement for repairs, modifications and/or maintenance of vessels owned by Plaintiffs pursuant to the Agreement(s) prepared by BP;

3)  Pre-judgment and post-judgment interest;

4)  Attorney's fees and litigation costs and expenses;

5) And for all such other and further relief as they may show themselves justly entitled to receive.

RESPECTFULLY SUBMITTED, this the 11th day of January, 2011.

BALDWIN HASPEL BURKE & MAYER, LLC

BY:     S\  Bernard H. Ticer_____
        DAVID L. CARRIGEE, LA Bar No.: 3892
        BERNARD H. TICER, LA Bar No.: 17979
        1100 Poydras Street, Suite 2200
        New Orleans, LA 70163

Telephone: 504/569-2900
Facsimile: 504/569-2099
*ATTORNEY FOR PLAINTIFFS:*
Anthony DiStefano, James Christopher Balius,
Edward D. Ross, Jr., Michael A. Cannette, John D.
Franklin, Jr., John D. Franklin, III, Jeffrey Powell,
George Boyd, Clarence R. Seymour, Jr., Jack
Tiblier, Patrick Poirson, Michael Butler, Michael A.
Cato, Robert Anderson, James A. Miller, Robert E.
Clisby, Mike Foto, James Larry Schonewitz, Allen
Johnson and Johnny O'Brien

**PLEASE SERVE:**

**BP America Production Company**
(Through its registered agent for service)
CT Corporation System
5615 Corporate Blvd, Ste. 400B
Baton Rouge, LA 70808

**AND**

**BP Exploration and Production Company, Inc.**
(Through its registered agent for service)
CT Corporation System
5615 Corporate Blvd, Ste. 400B
Baton Rouge, LA 70808

0422576